## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KATHY RICHBURG, ADRIANA GAMBOA, JEFFREY KOENIG, and CINDY MCGLONE, individually and on behalf of all others similarly situated, | CASE NO. 1:22-cv-2420 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| CONAGRA BRANDS, INC. | |
| Defendant, | |

## CLASS ACTION COMPLAINT

Plaintiffs Kathy Richburg, Adriana Gamboa, Jeffrey Koenig, and Cindy McGlone ("Plaintiffs") individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Conagra Brands, Inc. ("Conagra" or "Defendant") and allege the following based on personal knowledge as to themselves, and as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE ACTION

1.      This action concerns Conagra's false and misleading labeling of its Orville Redenbacher's® microwave popcorn products ("PFAS Popcorn" or "Products")[1], which are prominently labeled as containing "only real ingredients" and "100% ingredients from natural

---

[1] The action concerns varieties of Orville Redenbacher's® microwave popcorn products, which, based on information and belief, utilize a substantially similar (if not identical) microwave popping bag. As alleged herein, Conagra conceals the inclusion of PFAS in its Products from consumers. Accordingly, discovery will reveal the exhaustive list of substantially similar Products that are included in this action.

sources," when, in fact, Plaintiffs' testing has revealed the Products contain per- and polyfluoroalkyl substances ("PFAS"). .

2.     Conagra formulates, manufactures, markets and sells the Products, which it uniformly represents as containing "only real ingredients," including "100% ingredients from natural sources."[2]





3.      As one of North America's leading packaged food manufacturers, with products in 97% of America's households, Conagra knows the importance of marketing and labeling and the value of the label representations it carefully chooses for placement on its products.

4.      Conagra intentionally uses the words "natural" and "real" to describe the source of its Products' ingredients. "Natural" is defined as "found in nature and not involving anything made or done by people,"[3] "not having any extra substances or chemicals added," and "not containing anything artificial."[4]

5.      "Real"      is      defined      as      "produced using traditional methods and without artificial substances"[5]  and "not fake, false, or artificial"[6] and thus likewise confirms for reasonable consumers that the Products will be free from ingredients that are artificial or human-made.

6.      Reasonable consumers, therefore, fairly and reasonably understand that a product marketed as containing "100% ingredients from *natural* sources" and "only real ingredients" would not contain human-made chemicals, let alone human-made chemicals known to be harmful.

7.      However, despite Conagra's consistent and pervasive marketing of the Products as only containing natural and real ingredients, the Products actually contain significant levels of PFAS chemicals—a category of human-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health concerns.

8.      Conagra knows that consumers are concerned with the ingredients in their food. Thus, Conagra has intentionally utilized its marketing, centering on its use of only "natural" and

---

[3] https://dictionary.cambridge.org/us/dictionary/english/natural
[4] https://www.britannica.com/dictionary/natural
[5] https://dictionary.cambridge.org/us/dictionary/english/real
[6] https://www.britannica.com/dictionary/real

"real" ingredients, to drive sales and increase profits, including by targeting health-conscious consumers who reasonably believe that the Products are free from unnatural or artificial ingredients like harmful human-made chemicals.

9.     The presence of PFAS chemicals in the Products is entirely inconsistent with Conagra's uniform representations and renders them "unnatural" and not "real" by definition.

10.     As a result of Conagra's misconduct, Plaintiffs and putative Class Members have suffered injury in fact, including economic damages.

11.     Plaintiffs bring this suit to halt Conagra's dissemination of false and misleading representations and to correct the false and misleading perception that Conagra's representations have created in the minds of reasonable consumers.

12.     Plaintiffs seek damages, injunctive relief, and other equitable remedies for themselves and for the proposed classes.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because at least one Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Defendant because it is headquartered in this District, has substantial aggregate contacts with this District, including engaging in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing

injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the States of Illinois.

15.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, Defendant transacts business in this District, and Defendant has intentionally availed itself of the laws and markets within this District.

## PARTIES

16.     At all relevant times, Plaintiff Kathy Richburg has resided in Cook County, Illinois.

17.     At all relevant times, Plaintiff Adriana Gamboa has resided in Los Angeles County, California.

18.     At all relevant times, Plaintiff Jeffrey Koenig has resided in Orange County, New York.

19.     At all relevant times, Plaintiff Cindy McGlone has resided in Clay County, Florida.

20.     Conagra Brands, Inc. is incorporated in Delaware with its principal place of business located at 222 W. Merchandise Mart Plaza, Suite 1300, Chicago, Illinois.

## FACTUAL ALLEGATIONS

### Orville Redenbacher's® Microwave Popcorn Products

21.     Microwave popcorn is a popular snack item enjoyed by millions of consumers. Since it was first introduced in the 1980s, it has made up a significant portion of the snack food market. As the COVID-19 pandemic forced millions of Americans to spend more time at home,

the microwave popcorn industry increased nearly 15% percent, making it a $1.0 billion dollar category of the snack food industry.[7]

22.　Popcorn is popular for a variety of reasons, but its relative healthfulness is chief among them. Popcorn is a whole-grain that is naturally low in fat and calories, sugar-free, and gluten-free, making it a good fit for a variety of diets and health-conscious lifestyles.[8]

23.　The Products at issue are microwave popcorn products sold under the Orville Redenbacher's® brand name. The Orville Redenbacher's® brand is owned by Conagra and is one of the most widely recognized and top-selling microwave popcorn brands in the United States.

24.　The Products are sold in numerous varieties including, but not limited to, Ultimate Butter, Movie Theater Butter, Kettle Korn, SmartPop!, and Tender White.

25.　The Products are sold at mass market retailers and grocery stores throughout the United States, including Target, Walmart, Publix, Meijer's, and Walgreens, as well as authorized online retailers such as Amazon.

26.　Microwave popcorn, including the Products at issue in this case, is prepared by heating a specially designed bag that contains unpopped popcorn kernels and any additional additives, such as butter and salt. The bag is placed directly in the microwave where the heat from cooking pops the kernels, creating the finished popcorn product.

27.　Based on information and belief, all of the Products utilize a substantially similar, if not identical, microwave popping bag.

***Defendant's False and Deceptive Advertising***

---

[7] *Popcorn Sales Pop Off With Rise In At-Home Consumption Occasions, Gifting*, CANDY & SNACK TODAY, https://candyusa.com/cst/popcorn-sales-pop-off-with-the-rise-of-at-home-consumption-occasions-gifting/ (Last accessed March 22, 2022).
[8] *All About Popcorn*, POPCORN.ORG, https://www.popcorn.org/All-About-Popcorn/Our-Story (Last accessed March 22, 2022).

28.     Conagra uniformly represents the Products as a food that is made with "Only Real Ingredients" and "100% ingredients from natural sources" (collectively, "Natural Ingredient Representations").

29.     The Natural Ingredient Representations appear prominently on the front[9] and sides[10] of the Products' packaging:



---

[9]

https://www.amazon.com/dp/B076K6MS3V?ref_=cm_sw_r_cp_ud_dp_WRPT0R4H96G5HXH690R7
[10] https://www.festfoods.com/shop/?id=4584773&n=orville-redenbacher-s-gourmet-popping-corn-butter-single-serve-mini-bags-12-ct



30. The Natural Ingredient Representations also appear on the Products' individual microwave bags[11], where they are conspicuously displayed next to important microwave instructions and safety warnings:



---

11

https://www.amazon.com/dp/B000CSRBXY?ref_=cm_sw_r_cp_ud_dp_PT034BB599AZKMZ7T9S9

31.    The Natural Ingredient Representations are central to Conagra's marketing and sale of its Products and are strategically employed to convince consumers that the Products are free of unnatural or artificial ingredients, including toxic human-made ingredients.

32.    Conagra corroborates its label statements on its website by featuring images of these boxes with the Natural Ingredient Representations. For example, the Popcorn's website displays the following[12]:



MOVIE THEATER BUTTER     MINI SIZE MOVIE THEATER BUTTER POPCORN     POUR OVER MOVIE THEATER BUTTER

33.    Conagra also promotes its PFAS Popcorn on its social media accounts by posting images of the Products' boxes, which contain the Natural Ingredient Representations[13]:

---

[12] https://www.orville.com/buttery-popcorn (Last accessed April 12, 2022).
[13] https://www.instagram.com/p/CR13EzTN8zu/ (Last accessed April 12, 2022).



34. Further, Conagra is intentional in its design of the Natural Ingredient Representations. Conagra admits that it purposefully designs its product labeling as "simple enhancements" designed to entice health-conscious consumers by helping them "make better-informed food choices to improve their diet and health."[14]

35. Conagra's focus on its "real" and "natural" labeling carries through all aspects of its marketing. Conagra uses "SmartLabel" – an online resource that provides consumers with detailed information on products' ingredients and other attributes.[15]

36. For example[16]:

---

[14]https://www.conagrabrands.com/our-company/overview/company-milestones (Last accessed April 13, 2022).
[15] https://www.smartlabel.org/faq
[16] https://smartlabel.labelinsight.com/product/6376409/other/claims (Last accessed April 6, 2022).



37.     Conagra also spotlights its "free from" product attributes on the Products' boxes and its online marketing of the Products, in an effort to bolster its Natural Ingredient Claims[17]:



38.     Conagra is well aware that the future success of its business is dependent on its ability to meet consumer demand for food products that exclude ingredients which are known or suspected to be harmful to human health. In assessing potential risks to its sales and profits, Conagra has acknowledged that "[h]ealth care issues facing the United States and health-conscious consumer expectations have put increasing pressure on the food industry to constantly

_____

[17] https://www.orville.com/ (Last accessed April 6, 2022).

evaluate the nutritional profiles of its products. If our products fail to keep up with health trends and consumer expectations, our business performance may be negatively impacted."[18]

39.     Conagra is also aware that its business could be affected by consumer concerns or perceptions regarding the health effects of certain product ingredients.[19] Accordingly, Conagra's brand portfolio—and more importantly, its marketing of those brands—has evolved to satisfy changing food preferences, such as demand for products that eliminate unnatural, human-made, or toxic chemicals.

40.     To further distinguish itself from its competitors in its effort to appeal to health-conscious consumers, and to garner the trust of those consumers, Conagra has also engaged in a public relations campaign in which it represents itself as being transparent about the ingredients in its products:



CONTENTS > GOOD FOOD

## Product Transparency

Conagra Brands is committed to providing access to the information consumers want and need to make informed decisions about what they eat.

Image 2.[20]

---

[18] https://www.conagrabrands.com/sites/g/files/qyyrlu371/files/2016-10/ConAgra%20Corporate%20Responsibility%20Report_2011.pdf (Last accessed April 14, 2022).

[19] https://www.sec.gov/ix?doc=/Archives/edgar/data/0000023217/000156459021037738/cag-10k_20210530.htm

[20] https://www.conagrabrands.com/citizenship-reports/conagra-brands-citizenship-report-2021 (Last accessed April 14, 2022).

41. Conagra claims to "take food safety seriously every step of the way—from sourcing safe ingredients, to implementing appropriate shipping and storage, to packaging our food with clear and safe directions for microwave preparation."[21]

***PFAS Chemicals and Associated Risks***

42. PFAS are a category of highly persistent and potentially harmful <u>human-made chemicals</u>.[22]

43. PFAS are <u>not naturally occurring</u>.[23] They were first developed by scientists in the 1940s.[24] Thus, they are indisputably "unnatural" and not "real."

44. The human-made PFAS chemicals, which are in the PFAS Popcorn, are sometimes called "forever chemicals" because they bioaccumulate, or build up in the body over time.

45. Diet is considered a major route of PFAS exposure for humans, and reasonable consumers purchasing products represented as natural would not expect them to contain harmful human-made chemicals, such as PFAS .[25]

46. PFAS chemicals have been associated with a variety of negative health effects for humans and the environment. The health risks associated with PFAS include, but are not limited to, decreased male and female fertility, negative developmental effects or delays in children, increased risk of cancers, liver damage, asthma and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.[26]

---

[21] https://www.conagrabrands.com/our-company/corporate-social-responsibility/food-safety (Last accessed April 14, 2022).
[22] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained (last visited Nov. 27, 2021).
[23] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html
[24] https://www.3m.com/3M/en_US/pfas-stewardship-us/pfas-history/
[25] *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, Environmental Health Perspectives, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092
[26] *See* https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas; [26] Center for Disease Control and Prevention Agency for Toxic Substances and

47.     According to the Environmental Protection Agency, limiting exposure to PFAS can help protect individual health. "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[27]

48.     Because PFAS accumulates in body tissues over time, the most obvious way to avoid exposure is for consumers to avoid products which they know contain PFAS.[28]

49.     Conagra is well aware of this, which is exactly why it has engaged in an aggressive, uniform marketing campaign intended to convince consumers that the Products are natural and real.

50.     Conagra has engaged in this uniform marketing campaign in an effort to convince reasonable consumers to believe that the Products are superior to other products that are not natural or real.

51.     Reasonable consumers purchasing the Products would believe, based on Conagra's natural and real representations, that the Products do not contain unnatural or human-made chemicals that could adversely impact their health.

---

Disease Registry, *What are the health effects of PFAS?*, U.S. DEPT. OF HEALTH AND HUMAN SERVS., https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last visited Nov. 27, 2021); Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, N.Y. TIMES (Sept. 23, 2020, updated Oct. 18, 2021) https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.
[27] https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk
[28] https://www.healthline.com/health-news/how-to-reduce-your-exposure-to-pfas-the-hidden-toxic-forever-chemicals#How-to-limit-PFAS-exposure

*PFAS Use in Microwave Popcorn Bags*

52.   Food contact materials, such as wrappers and packaging, are often treated with PFAS to increase water and grease resistance and enhance the material's non-stick properties.[29] PFAS can also help ingredients from leaking out of their packaging.[30]

53.   The use of PFAS chemicals in food contact materials is concerning because studies have confirmed that PFAS migrates to food, where it is then ingested by consumers. [31]

54.   Compared with other types of materials that come into contact with food, microwave popcorn bags have among the highest concentrations of PFAS chemical migration. [32]

55.   In fact, studies show that consumption of microwave popcorn is associated with higher PFAS chemical levels in humans as a direct consequence of PFAS migration from microwave popcorn bags; furthermore, consuming microwave popcorn creates significantly higher exposure to PFAS in humans than other foods that come into contact with packaging materials containing PFAS.[33]

56.   Part of the reason that microwave popcorn creates a unique risk of PFAS exposure to humans is due to the fact that PFAS chemical migration increases with higher temperatures,

---

[29] https://saferchemicals.org/wp-content/uploads/2018/12/saferchemicals.org_take_out_toxics_pfas_chemicals_in_food_packaging.pdf?x15132 (Last accessed April 21, 2022).; *See also* Begley TH, Hsu W, Noonan G, Diachenko G. Migration of fluorochemical paper additives from food-contact paper into foods and food simulants. Food Addit Contam Part A Chem Anal Control Expo Risk Assess. 2008 Mar;25(3):384-90. doi: 10.1080/02652030701513784. PMID: 18311629.
[30] https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092
[31] *Migration of fluorochemical paper additives from food-contact paper into foods and food simulants*, Food Additives & Contaminants, https://doi.org/10.1080/02652030701513784
[32] *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, Environmental Health Perspectives, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092
[33] Presence of Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) in Food Contact Materials (FCM) and Its Migration to Food - PMC (nih.gov)

longer contact time with the treated packaging, and the presence of emulsifiers. [34] All of these factors are present when preparing popcorn.

57.     Studies have shown that oil containing even small amounts of an emulsifier—as is present in the Products[35]—can significantly enhance migration of a fluorochemical from paper.[36] Additionally, studies have shown that salt—also present in the Products—increases the migration of PFAS chemicals to food.[37]

58.     Studies have also found that PFAS chemicals are in the vapors from cooked microwave popcorn bags, indicating the potential for inhalation exposure when the bags are opened by consumers.[38]

***Plaintiffs' Independent Testing Confirms the Presence of PFAS Chemicals in the Products***

59.     Plaintiffs sought independent third-party testing to determine whether the Products' bags contain PFAS chemicals.

60.     Plaintiffs' independent testing was conducted in accordance with accepted industry standards for detecting whether the Products contain organic fluorine, which is a surrogate for PFAS chemicals.

---

[34] Dietary Habits Related to Food Packaging and Population Exposure to PFASs | Environmental Health Perspectives | Vol. 127, No. 10 (nih.gov)
[35] Based on information and belief, Conagra uses palm oil as an emulsifier in its Products. *See https://productswithoutpalmoil.com/palm-oil-uses-what-is-palm-oil-used-for/#Why_palm_oil_is_used_in_food*
[36] *Migration of fluorochemical paper additives from food-contact paper into foods and food simulants*, Food Additives & Contaminants, https://doi.org/10.1080/02652030701513784
[37] *Presence of Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) in Food Contact Materials (FCM) and Its Migration to Food*, Foods., https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8306913/
[38] *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, Environmental Health Perspectives, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092

61. There are more than 12,000 PFAS chemicals currently in existence.[39] Accordingly, it is impractical, if not impossible, for scientists and researchers to test for the presence of each of these 12,000 chemicals in any particular sample.

62. The presence of organic fluorine in a sample, however, indicates the sample contains PFAS, and is therefore a widely-accepted method of determining whether a sample contains PFAS.

63. Here, Plaintiffs' testing detected the presence of **835 ppm** of organic fluorine in the Products.

64. By way of comparison, this is more than **eight times** the state of California's allowable limit for PFAS in certain types of food packaging (effective January 1, 2023), and therefore represents a significant level of PFAS.[40]

65. Plaintiffs' testing demonstrates that the Products contain significantly high levels of unnatural, human-made PFAS chemicals in the Products in direct opposition to Conagra's uniform representations.

***Defendant's Unlawful Conduct***

66. At all times relevant to this action, Conagra has been aware that its Products utilize PFAS chemicals to create grease resistance and/or enhance non-stick properties when cooking popcorn.

---

[39] https://comptox.epa.gov/dashboard/chemical-lists/pfasmaster (Last accessed April 11, 2022).
[40] https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=HSC&sectionNum=109000.&article=1.&highlight=true&keyword=pfas

67.     Since at least January 2006, Conagra has acknowledged to the public that it sells microwave popcorn in packaging coated with PFAS, including in a January 31, 2006 article in the Wall Street Journal.[41]

68.     Since at least 2006, shareholders have urged Conagra's Board of Directors to consider eliminating the use of PFAS in its food packaging, including in the PFAS Popcorn.[42]

69.     Since at least 2006, consumers have expressed concern about the use of PFAS in the Products, including by sending more than 13,500 personal letters to grocery store managers which asked grocery stores to discontinue the sale of food utilizing PFAS in its packaging, including the Products at issue here. Conagra was aware of this grass roots campaign, which was organized by advocacy group Ohio Citizen Action, and responded by issuing a cease-and-desist letter to the organization.[43]

70.     To capitalize on increasing consumer demand for products free from artificial ingredients, including harmful human-made chemicals like PFAS, Conagra has knowingly and willfully deployed a concerted strategy to distinguish its Products from competing options in the highly competitive snack industry by representing its PFAS Popcorn as a product free from artificial ingredients.

71.     Throughout the class period, Conagra has targeted health-conscious consumers by falsely and misleadingly representing its Products are only made with "natural" and "real" ingredients. Consequently, reasonable consumers believe the Popcorn is free of unnatural, human-made chemicals.

---

[41] https://www.wsj.com/articles/SB113867354944860566
[42] https://iehn.org/resources/resolution/conagra-pfoa-related-chemicals-in-product-packaging
[43] https://www.healthandenvironment.org/partnership_calls/363

19

72. Conagra's strategy to stay aligned with consumer preferences in order to retain a competitive advantage in the marketplace, which includes representing to sell products which only contain natural and real ingredients, would inevitably be negatively impacted if it disclosed the presence of PFAS in its Products.

73. Further, Conagra's claims touting its bona fides as a company dedicated to natural, clean products and sustainability, in conjunction with its conspicuous representations pertaining to the Products' other attributes that consumers associate with products free from artificial ingredients, further contribute to the reasonable consumer perception and belief that the Products contain only natural ingredients and are free of human-made chemicals.

74. Consumers lack the expertise to ascertain the true ingredients in Conagra's Products prior to purchase. Accordingly, reasonable consumers must, and do rely on Conagra to accurately and honestly advertise its Products' ingredients as real and natural, and not contradict those representations by using unnatural human-made chemicals in its Products that are known to contaminate food upon cooking and which pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

75. Conagra's representations that the Products are natural and real, including *inter alia*, the Natural Ingredient Representations described herein, are false because products containing toxic, human-made ingredients like PFAS are unnatural and not real by definition.

76. Conagra's Natural Ingredient Representations are likely to mislead reasonable consumers, and indeed did mislead Plaintiffs and Class members regarding the presence of PFAS chemicals in its Products. Accordingly, these acts and practices by Conagra are deceptive.

77. Customers reasonably relied on Conagra's false statements and misleading representations, and reasonably expected that Conagra's Products would conform with its Natural

20

Ingredient Representations and, as such, would not contain unnatural, human-made PFAS chemicals.

78.     Conagra's false statements, misleading representations and material omissions are intentional, or otherwise entirely careless, and render its Products worthless or less valuable.

79.     Plaintiffs purchased the Products because they wanted microwave popcorn that did not contain artificial ingredients or chemical ingredients not from natural sources.

80.     If Conagra had disclosed to Plaintiffs and putative Class Members that its Popcorn contained PFAS chemicals, Plaintiffs and putative Class Members would not have purchased Conagra's PFAS Popcorn or they would have paid less for the products.

81.     Plaintiffs and Class Members were among the intended recipients of Conagra's deceptive representations and omissions described herein.

82.     Conagra's representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

83.     The materiality of the representations described herein also establishes causation between Conagra's conduct and the injuries Plaintiffs and the Class Members sustained.

84.     Alternative formulations, designs and materials for enhancing grease control and non-stick properties were available to Conagra at the time it formulated, designed and manufactured its PFAS Popcorn Products, and such alternative formulations and designs were and are used by other manufacturers to produce and sell natural, PFAS-free microwave popcorn. These alternatives include greaseproof vegetable parchment paper and non-fluorinated coatings

using aqueous dispersions of waxes, starch, or cellulose gum.[44] In fact, studies have shown that most PFAS alternatives in food packaging are cost-neutral for retailers.[45]

85.     Dating back to at least 2006, Conagra committed to study alternatives to eliminate PFAS in the Products' packaging, but based on information and belief, has failed to implement any significant changes.[46]

86.     Conagra is aware that the consumers, including its own shareholders, are concerned about the use of PFAS in its Products, yet it has continued to market and advertise its Products using the Natural Ingredient Representations in order to profit off of unsuspecting consumers, including Plaintiffs and Class Members.

87.     The presence of PFAS chemicals in Conagra's Products is entirely inconsistent with its Natural Ingredient Representations.

88.     Conagra's knowingly false and misleading Natural Ingredient Representations have the intended result of convincing reasonable consumers that its Products are made from only "real" and "natural" ingredients and therefore do not contain unnatural, human-made toxic chemicals. No reasonable consumer would consider Conagra's Products as containing only natural or real ingredients if they knew that the Products' packaging contained harmful, unnatural, human-made PFAS chemicals which migrate into and contaminate the Product when following Conagra's cooking instructions.

---

[44] Ramírez Carnero A, Lestido-Cardama A, Vazquez Loureiro P, Barbosa-Pereira L, Rodríguez Bernaldo de Quirós A, Sendón R. Presence of Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) in Food Contact Materials (FCM) and Its Migration to Food. *Foods*. 2021; 10(7):1443. https://doi.org/10.3390/foods10071443

[45] https://norden.diva-portal.org/smash/get/diva2:1201324/FULLTEXT01.pdf

[46] https://www.sehn.org/sehn/news-release-toxics-in-your-portfolio-companies-facing-shareholder-resolutions-on-chemical-risks-in-products-jump-from-just-three-in-04-05-to-17-in-06-07

89. Conagra's false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiffs and Class Members.

90. In making the false, misleading, and deceptive representations, Conagra knew and intended consumers would pay a premium for the Products over comparable products that are not made from naturally sourced or real ingredients.

91. Plaintiffs and Class Members all paid money for the Products, however, they did not obtain the full value of the advertised Products due to Conagra's misrepresentations as detailed herein. Plaintiffs and Class Members purchased, purchased more of, or paid more for, the Products than they would have had they known the truth about the Products' unnatural, human-made, and harmful ingredients. Thus, Plaintiffs and Class Members have suffered injury in fact and lost money or property as a result of Conagra's wrongful conduct.

92. Conagra's widespread marketing campaign portraying the Products as only containing ingredients from "natural sources" and otherwise representing them to be natural and real as detailed herein, is misleading and deceptive to consumers because the Products are made with unnatural, human-made, and toxic ingredients. Plaintiffs bring this action on behalf of the proposed Classes to stop Conagra's misleading practices.

*Plaintiffs' Individual Facts*

**Plaintiff Richburg's Purchase of the Products**

93. Plaintiff Richburg is a citizen of Illinois and resides in Cook County.

94. For two years or more during the Class Period, Plaintiff Richburg purchased Conagra's Products in Illinois and Indiana.

95.     In or around September 2021, Plaintiff Richburg most recently purchased Conagra's Tender White – Gourmet White Corn Blended with Real Butter at a Walmart located in Crestwood, Illinois.

96.     In or around December 2021, Plaintiff Richburg most recently purchased Conagra's Tender White – Gourmet White Corn Blended with Real Butter at a Walmart located in Hammond, Indiana.

97.     Plaintiff Richburg purchased the Products roughly every three to four months.

98.     Prior to purchasing the Products, Richburg reviewed the Products' labels and relied on Conagra's Natural Ingredient Representations thereon.

99.     In reasonable reliance on the Natural Ingredient Representations, Plaintiff Richburg paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading.

100.     Conagra's Natural Ingredient Representations were part of the basis of the bargain in that Plaintiff Richburg attributed value to Conagra's representations and Plaintiff Richburg would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Natural Ingredient Representations were untrue and/or misleading.

101.     Plaintiff Richburg paid a price premium for empty promises that the Products were free of harmful chemicals.  Should Plaintiff Richburg encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising.  If Conagra takes corrective action to ensure the truthfulness of the Natural Ingredient Representations and/or correct the Products' labels, Plaintiff Richburg would consider buying the Products in the future.

**Plaintiff Gamboa's Purchase of the Product**

102.    Plaintiff Gamboa is a citizen of California and resides in Los Angeles County.

103.    For two years or more during the Class Period, Plaintiff Gamboa purchased Conagra's Products in California.

104.    In or around February 2022, Plaintiff Gamboa most recently purchased Conagra's Movie Theatre Butter Microwave Popcorn at a Walmart located in La Mirada, California.

105.

106.    Plaintiff Gamboa purchased the Products roughly every two to three months.

107.    Prior to purchasing the Products, Gamboa reviewed the Products' labels and relied on Conagra's Natural Ingredient Representations thereon.

108.    In reasonable reliance on the Natural Ingredient Representations, Plaintiff Gamboa paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading.

109.    Conagra's Natural Ingredient Representations were part of the basis of the bargain in that Plaintiff Gamboa attributed value to Conagra's representations and Plaintiff Gamboa would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Natural Ingredient Representations were untrue and/or misleading.

110.    Plaintiff Gamboa paid a price premium for empty promises that the Products were free of harmful chemicals.  Should Plaintiff Gamboa encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising.  If Conagra takes corrective action to ensure the truthfulness of the Natural Ingredient Representations and/or correct the Products' labels, Plaintiff Gamboa would consider buying the Products in the future.

**Plaintiff Koenig's Purchase of the Product**

111.    Plaintiff Koenig is a citizen of New York and resides in Orange County.

112.     For two years or more during the Class Period, Plaintiff Koenig purchased Conagra's Products in New York.

113.    In or around December 2021, Plaintiff Koenig most recently purchased Conagra's smart pop! Butter at a Shop Rite located in Chester, New York.

114.    Plaintiff Koenig purchased the Products approximately every six to eight months.

115.    Prior to purchasing the Products, Koenig reviewed the Products' labels and relied on Conagra's Natural Ingredient Representations thereon.

116.    In reasonable reliance on the Natural Ingredient Representations, Plaintiff Koenig paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading.

117.    Conagra's Natural Ingredient Representations were part of the basis of the bargain in that Plaintiff Koenig attributed value to Conagra's representations and Plaintiff Koenig would not have purchased the Products, or would not have purchased them on the same terms, if he knew the Natural Product Promises were untrue and/or misleading.

118.    Plaintiff Koenig paid a price premium for empty promises that the Products were free of harmful chemicals. Should Plaintiff Koenig encounter any of the Products in the future, he cannot rely on the truthfulness of the labels' statements absent corrective advertising.  If Conagra takes corrective action to ensure the truthfulness of the Natural Ingredient Representations and/or correct the Products' labels, Plaintiff Koenig would consider buying the Products in the future.

**Plaintiff McGlone's Purchase of the Product**

119.    Plaintiff McGlone is a citizen of Florida and resides in Clay County.

120. For two years or more during the Class Period, Plaintiff McGlone purchased Conagra's Products in Florida.

121. In or around March 2022, Plaintiff McGlone most recently purchased Conagra's Movie Theatre Butter Microwave Popcorn at a Walmart located in Middleburg, Florida.

122. Plaintiff McGlone purchased the Products roughly every two weeks.

123. Prior to purchasing the Products, McGlone reviewed the Products' labels and relied on Conagra's Natural Ingredient Representations thereon.

124. In reasonable reliance on the Natural Ingredient Representations, Plaintiff McGlone paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading.

125. Conagra's Natural Ingredient Representations were part of the basis of the bargain in that Plaintiff McGlone attributed value to Conagra's representations and Plaintiff McGlone would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Natural Ingredient Representations were untrue and/or misleading.

126. Plaintiff McGlone paid a price premium for empty promises that the Products were free of harmful chemicals. Should Plaintiff McGlone encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising. If Conagra takes corrective action to ensure the truthfulness of the Natural Product Promises and/or correct the Products' labels, Plaintiff McGlone would consider buying the Products in the future.

## INJURY TO THE PUBLIC AT-LARGE AND POTENTIAL FOR FUTURE HARM

127. Conagra's wrongful conduct harms the public-at-large.

128.     PFAS chemicals, also known as "forever chemicals," are a category of highly persistent and potentially human-made chemicals that have been associated with numerous negative health effects for humans and harmful environmental impacts.

129.     PFAS chemicals known to negatively impact the human body and the environment including, but not limited to, decreased fertility, developmental effects or delays in children, increased risk of cancers, liver damage, increased risk of asthma and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.

130.     Because Conagra's deceptive advertising is ongoing and directed to the public, and because Conagra continues to sell its Products containing PFAS chemicals, the deception poses an ongoing risk to the public.

131.     As such, a public injunction must be provided in order to enjoin Conagra's continued harm of consumers and the public-at-large.

**TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

132.     Conagra has had actual knowledge since at least 2006 that its Products contained unnatural, human-made PFAS chemicals which pose a risk of harm to human health.

133.     Although Conagra was aware of the deception in its advertising, marketing, packaging, and sale of its Products given the inclusion of PFAS chemicals, it took no steps to disclose to Plaintiffs or Class Members that its Products contained PFAS chemicals.

134.     Despite its knowledge, Conagra has fraudulently misrepresented the Products as having qualities and characteristics they do not, while concealing the fact that its Products contain PFAS chemicals.

135. Conagra made, and continues to make, affirmative false statements and misrepresentations to consumers, to promote sales of its Products, including its Natural Ingredient Representations.

136. Conagra misrepresented and concealed material facts that would have been important to Plaintiffs and Class Members in deciding whether to purchase the Products. Conagra's misrepresentation and concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members reasonably relied upon Conagra's misrepresentations and concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

137. The PFAS chemicals in the design and/or manufacture of Conagra's Products was not reasonably detectible to Plaintiffs and Class Members.

138. At all times, Conagra actively and intentionally misrepresented the qualities and characteristics of the Products, while concealing the existence of the PFAS chemicals and failing to inform Plaintiffs or Class Members of the existence of the PFAS chemicals in its Products. Accordingly, Plaintiffs' and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

139. Conagra's statements, words, and acts were made for the purpose of deceiving the public, and suppressing the truth that the Products contained unnatural, human-made PFAS chemicals.

140. Conagra misrepresented the Products and concealed the PFAS chemicals for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.

141. As a result of Conagra's intentional misrepresentations and active concealment of the PFAS chemicals and/or failure to inform Plaintiffs and Class Members of the PFAS chemicals,

any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Conagra is estopped from relying on any statutes of limitations in light of its intentional misrepresentations and active concealment of the inclusion of unnatural, human-made PFAS chemicals in the Products.

142.    Further, the causes of action alleged herein did not occur until Plaintiffs and Class Members discovered that the Products contained PFAS chemicals. Plaintiffs and Class Members had no realistic ability to discern that the Products contained PFAS chemicals until they learned of the existence of the PFAS chemicals. In either event, Plaintiffs and Class Members were hampered in their ability to discover their causes of action because of Conagra's active concealment of the existence and true nature of the PFAS Popcorn Products.

## FED. R. CIV. P. 9(b) ALLEGATIONS

143.    Although Conagra is in the best position to know what content it placed on its packaging, website(s), and social media sites during the relevant timeframe, and the knowledge that it had regarding the PFAS chemicals and its failure to disclose the existence of PFAS chemicals in the Products to Plaintiffs and consumers, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

144.    **WHO**: Conagra made its Natural Ingredient Representations on the Products' packaging, online, and its marketing and advertising of the Products.

145.    **WHAT**: Conagra's conduct here was, and continues to be, deceptive and fraudulent because of its Natural Ingredient Representations. Thus, Conagra's conduct deceived Plaintiffs and Class Members into believing that the Products were manufactured and sold with the represented qualities. Conagra knew or should have known this information is material to

reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet it continued to pervasively market the Products as possessing qualities they do not.

146. **WHEN**: Conagra made material misrepresentations, false statements and/or omissions during the putative Class periods and at the time Plaintiffs and Class Members purchased the Products, prior to and at the time Plaintiffs and Class Members made claims after realizing the Products contained unnatural, human-made chemicals, and continuously throughout the applicable Class periods.

147. **WHERE**: Conagra's marketing message was uniform and pervasive, carried through false statements, misrepresentations, and/or omissions on the Products' packaging, as well as on website(s) and social media accounts used to market and advertise the Products.

148. **HOW**: Conagra made false statements, misrepresentations and/or material omissions regarding the presence of PFAS chemicals in the Products.

149. **WHY**: Conagra made false statements, misrepresentations and/or material omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay for the Products over other brands that did not make similar Natural Ingredient Representations, the effect of which was that Conagra profited by selling the Products to many thousands of consumers.

150. **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have, absent Conagra's misrepresentations, false and misleading statements.

## CLASS ACTION ALLEGATIONS

151. Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of themselves and the members of the following proposed nationwide class ("Nationwide Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the United States within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated**

152. Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of themselves and the members of the following proposed nationwide class ("Multi-State Consumer Protection Class")

> **During the fullest period allowed by law, all persons who purchased the Products in the States of California, Florida, Illinois, New York, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, Washington or any state with similar laws[47] within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**

---

[47] While discovery may alter the following, Plaintiffs assert that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: Arkansas (Ark. Code § 4-88-101, et seq.); Colorado (Colo. Rev. Stat. § 6-1-101, et seq.); Connecticut (Conn. Gen. Stat. § 42-110, et seq.); Delaware (Del. Code tit. 6, § 2511, et seq.); District of Columbia (D.C. Code § 28-3901, et seq.); Florida (Fla. Stat. § 501.201, et seq.); Hawaii (Haw. Rev. Stat. § 480-1, et seq.); Idaho (Idaho Code § 48-601, et seq.); Illinois (815 ICLS § 505/1, et seq.); Maine (Me. Rev. Stat. tit. 5 § 205-A, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws § 445.901, et seq.); Minnesota (Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. § 407.010, et seq.); Montana (Mo. Code. § 30-14-101, et seq.); Nebraska (Neb. Rev. Stat. § 59 1601, et seq.); Nevada (Nev. Rev. Stat. § 598.0915, et seq.); New Hampshire (N.H. Rev. Stat. § 358-A:1, et seq.); New Jersey (N.J. Stat. § 56:8-1, et seq.); New Mexico (N.M. Stat. § 57-12-1, et seq.); New York (N.Y. Gen. Bus. Law § 349, et seq.); North Dakota (N.D. Cent. Code § 51-15-01, et seq.); Oklahoma (Okla. Stat. tit. 15, § 751, et seq.); Oregon (Or. Rev. Stat. § 646.605, et seq.); Rhode Island (R.I. Gen. Laws § 6-13.1-1, et seq.); South Dakota (S.D. Code Laws § 37-24-1, et seq.); Texas (Tex. Bus. & Com. Code § 17.41, et seq.); Virginia (VA Code § 59.1-196, et seq.); Vermont (Vt. Stat. tit. 9, § 2451, et seq.); Washington (Wash. Rev. Code § 19.86.010, et seq.); West Virginia (W. Va. Code § 46A-6- 101, et seq.); and Wisconsin (Wis. Stat. § 100.18, et seq.). *See Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

153.     Plaintiff Richburg brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following subclass ("Illinois Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the State of Illinois within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**

154.     Plaintiff Gamboa brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following subclass ("California Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the State of California within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**

155.     Plaintiff Koenig brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of himself and the members of the following subclass ("New York Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the State of New York within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**

156.     Plaintiff McGlone brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following subclass ("Florida Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the State of Florida within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**

157.     Specifically excluded from these definitions are: (1) Conagra, any entity in which Conagra has a controlling interest, and its legal representatives, officers, directors, employees,

assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiffs reserve the right to amend the Class definition as necessary.

158. <u>Numerosity</u>: The Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of at least thousands of people throughout the United States, as well as in each of the following states: California, Florida, Illinois, and New York. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The Class is readily identifiable from information and records in the possession of Conagra.

159. <u>Typicality</u>: The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, purchased the Products that were designed, manufactured, marketed, advertised, distributed, and sold by Conagra. Plaintiffs, like all Class Members, have been damaged by Conagra's misconduct in that, inter alia, they have incurred or will continue to incur damage as a result of overpaying for a product containing PFAS chemicals which are known to pose a risk of harm to the human body. Furthermore, the factual basis of Conagra's misconduct is common to all Class Members because Conagra has engaged in systematic deceptive and fraudulent behavior that was deliberate and results in the same injury to all Class Members.

160. <u>Commonality</u>: Common questions of law and fact exist as to all Members of the Class. These questions predominate over questions that may affect only individual Class Members because Conagra has acted on grounds generally applicable to the Class. Such common legal or factual questions include, *inter alia*:

   a. Whether the Products contain PFAS chemicals;

    b.    Whether Conagra misrepresented that the Products contain only real and naturally-sourced ingredients;

    c.    Whether Conagra's practices in marketing, advertising and packaging the Products tend to mislead reasonable consumers into believing that the Products are only made with real ingredients and ingredients from natural sources;

    d.    Whether Conagra omitted or failed to disclose material information to Plaintiffs and Class Members regarding the Products;

    e.    Whether Conagra concealed from and/or failed to disclose to Plaintiffs and Class Members that the Products contained PFAS chemicals;

    f.    Whether Conagra's breached express warranties relating to the Products;

    g.    Whether Conagra breached the implied warranty of merchantability relating to the Products;

    h.    Whether Conagra engaged in deceptive trade practices by selling, packaging, advertising and/or marketing the Products containing PFAS chemicals;

    i.    Whether Conagra engaged in false or misleading advertising by selling, packaging, and/or marketing the Products containing PFAS chemicals;

    j.    Whether Plaintiffs and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

    k.    Whether Plaintiffs and Class Members either paid a premium for the Products that they would not have paid but for its false Natural Ingredient Representations or would not have purchased them at all;

    l.    Whether Plaintiffs and the other Class Members have been injured and the proper measure of their losses as a result of those injuries; and

    m.    Whether Plaintiffs and the other Class Members are entitled to injunctive, declaratory, or other equitable relief.

161.    <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class Members. They have no interests antagonistic to those of Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer products, misrepresentation, mislabeling, and PFAS chemicals class actions, and Plaintiffs intend to prosecute this action vigorously.

162.     <u>Injunctive/Declaratory Relief</u>: The elements of Rule 23(b)(2) are met. Conagra will continue to commit the unlawful practices alleged herein, and Plaintiffs and Class Members will continue to be deceived by Conagra's Natural Ingredient Representations and PFAS Omissions and unknowingly be exposed to the risk of harm associated with the PFAS chemicals in the Products. Conagra has acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief, public injunctive relief, and corresponding declaratory relief are appropriate respecting the Class as a whole.  Injunctive relief, and specifically public injunctive relief, is necessary in this action.

163.     <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer risk of harm and damages as a result of Conagra's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high given the average price point of the Products and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Conagra's misconduct. Absent a class action, Class Members will continue to incur damages, and Conagra's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

164.     Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

165.     Conagra has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class appropriate.

**COUNT I**
**VIOLATION OF THE**
**ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT**
**(On Behalf of Plaintiff Richburg and the Illinois Class)**

166.     Plaintiff Richburg, individually and on behalf of the Illinois Class, brings this cause of action and hereby adopt and incorporate by reference all allegations contained in Paragraphs 1-165 as if set fully set forth herein.

167.     In Illinois, the "Consumer Fraud and Deceptive Business Practices Act" 815 Ill. Comp. Stat. 505/1, *et seq*., prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' . . . ."

168.     Plaintiff Richburg and the Illinois Class Members were injured by Defendant's deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiff and the Class. Because Plaintiff and Class Members relied on Defendant's misrepresentations, concealments and omissions when purchasing Defendant's Products, they were injured at the time of purchase.

169.     Defendant does business in Illinois, sells and distributes the Products in Illinois, and engaged in deceptive acts and practices in connection with the sale of the Products in Illinois and elsewhere in the United States.

37

170.    The Products purchased by Plaintiff Richburg and Illinois Class Members were "consumer items" as that term is defined under the Illinois Consumer Fraud Act.

171.    Defendant engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Defendant as set forth above concerning the Products, which has caused damage and injury to Plaintiff Richburg and Illinois Class Members. Plaintiff Richburg and Illinois Class Members were injured by Defendant's unfair and deceptive acts at the time of purchasing the Products.

172.    Defendant represented, directly or indirectly, that the Products are made with "100% ingredients from natural sources" and "only real ingredients," when, in reality, they contain unnatural, human-made PFAS chemicals known to be harmful to humans and the environment.

173.    Defendant failed to disclose in their advertising statements the material fact that the Products are packaged in bags containing significant levels of PFAS chemicals that, when prepared according the package instructions, are known to migrate into the Products where they are then ingested by consumers.

174.    Defendant knew or should have known that their representations regarding the Products were false and misleading, and that by omitting and failing to disclose in their advertising the presence of PFAS chemicals in their Products' packaging, they were omitting material facts that would alter any reasonable consumer's decision to purchase the Products.

175.    Defendant's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

176.    Defendant intended Plaintiff Richburg and Illinois Class Members to rely on their deceptive acts when purchasing Defendant's Products.

177.    Defendant's deceptive acts proximately caused actual injury and damage to Plaintiff Richburg and Illinois Class Members at the time of purchase.

178.    Plaintiff Richburg and Illinois Class Members not have purchased, or would have paid less for, Defendant's Products marketed as containing only natural ingredients but for Defendant's material misrepresentations as described in this Complaint.

**COUNT II**
**VIOLATION OF THE**
**ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(On Behalf of Plaintiff Richburg and the Illinois Class)**

179.    Plaintiff Richburg, individually and on behalf of the Illinois Class, brings this cause of action and hereby adopt and incorporate by reference all allegations contained in Paragraphs 1-178 as if set fully set forth herein.

180.    The Illinois Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. 510/2, *et seq.*, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

181.    815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

182.    Defendant engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 510/2 when they misrepresented and deceptively concealed, suppressed and/or omitted the

material information known to Defendant as set forth above concerning the Products which has caused damage and injury to Plaintiff Richburg and the Illinois Class Members. Plaintiff Richburg and the Illinois Class Members were injured by Defendant's unfair and deceptive conduct at the time of purchasing Defendant's Products.

183.    Defendant represented, directly or indirectly, the Natural Ingredient Representations when, in reality, the Products contain unnatural, human-made PFAS chemicals known to be harmful to humans and the environment.

184.    Defendant failed to disclose in its advertising statements the material fact that the Products are packaged in bags containing significant levels of PFAS chemicals that, when prepared according the package instructions, are known to migrate into the Products where they are then ingested by consumers.

185.    Defendant knew or should have known that its representations regarding the Products were false and misleading, and that by omitting and failing to disclose in its advertising the presence of PFAS chemicals in its Products' packaging, it was omitting material facts that would alter any reasonable consumer's decision to purchase the Products.

186.    Defendant's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

187.    Defendant's deceptive acts proximately caused actual injury and damage to Plaintiff and the Class Members at the time of purchase.

188.    Plaintiff Richburg and Illinois Class Members would not have purchased, or would have paid less for, Defendant's Products marketed as containing only natural ingredients but for Defendant's material misrepresentations as described in this Complaint.

189. Defendant intended Plaintiff Richburg and all Illinois Class Members to rely on its deceptive acts when purchasing the Products.

**COUNT III**
**Violation of the California Consumer Legal Remedies Act ("CLRA")**
**California Civil Code §§ 1750, et seq.**
**(On Behalf of Plaintiff Gamboa and the California Class)**

190. Plaintiff Gamboa, individually and on behalf of the California Class, brings this cause of action and hereby adopt and incorporate by reference all allegations contained in Paragraphs 1-189 as if set fully set forth herein.

191. The conduct described herein took place in the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, et seq.

192. The CLRA applies to all claims of Plaintiff Gamboa and California Class Members because the conduct which constitutes violations of the CLRA by Defendant occurred within the State of California.

193. Plaintiff Gamboa and California Class Members are "consumers" as defined by Civil Code § 1761(d).

194. Defendant is a "person" as defined by California Civil Code § 1761(c).

195. The Products qualify as "goods" as defined by California Civil Code § 1761(a).

196. Plaintiff Gamboa's and the California Class Members' purchases of PFAS Popcorn Products are "transactions" as defined by California Civil Code § 1761(e).

197. As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer unlawful:

41

     a.     "Representing that goods...have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities which they do not have." Civil Code § 1770(a)(5); and

     b.     "Representing that goods...are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7).

198.    Defendant engages in unfair competition and/or unfair or deceptive acts or practices in violation of California Civil Code §§ 1770(a)(5) and (a)(7) when it represented through its advertising and other express representations, including the Natural Ingredient Representations, that its Products have benefits or characteristics that they do not actually have.

199.    As detailed in this Complaint, Defendant repeatedly engaged in conduct deemed a violation of the CLRA, has made representations regarding the Products' benefits or characteristics that they do not in fact have, and has represented the Products to be of a quality that they are not. Indeed, Defendant has concealed this information from consumers, including Plaintiff Gamboa and California Class Members.

200.    The Products are not made with "only real ingredients" or "100% ingredients from natural sources." As detailed above, Defendant violated the CLRA when it falsely represented that the Products meet a certain standard or quality.

201.    Further, Defendant's practice of advertising the Products with the intent not to sell them as advertised, and the knowledge that the Products are not as represented, violates the CLRA.

202.    Specifically, Defendant marketed and represented with the Natural Ingredient Representations when, in reality, the Products contain unnatural, harmful, and human-made PFAS chemicals.

203.    Defendant's deceptive practices are specifically designed to induce consumers, including Plaintiff Gamboa and California Class Members, to purchase or otherwise acquire the Products.

204. Defendant engages in uniform marketing, advertising, and packaging to reach consumers, including Plaintiff Gamboa. California Class Members, their agents, and/or third parties upon whom they rely, to persuade them to purchase and use the Products manufactured by Defendant. Defendant's advertising, marketing, websites, social media sites and packaging contain numerous false and misleading statements relating to the quality of and ingredients contained within the Products. These include, *inter alia*, representations that the Products contain "only real ingredients" and "100% ingredients from natural sources."

205. Despite these representations, Defendant omits and conceals information and material facts from consumers.

206. Consumers, including Plaintiff Gamboa and California Class Members, relied on Defendant's representations when they purchased the Products.

207. These business practices are misleading and/or likely to mislead consumers and should be enjoined.

208. On May 6, 2022, Plaintiff Gamboa provided written notice to Defendant via certified mail through the United States Postal Service demanding corrective actions pursuant to the CLRA, but Defendant failed to take any corrective action.

209. If Defendant does not thereafter correct its business practices, Plaintiffs will amend (or seek leave to amend) the Complaint to add claims for monetary relief, including restitution and actual damages under the CLRA.

210. Pursuant to California Civil Code § 1780, Plaintiff Gamboa and Class Members seek an order enjoining Conagra from the unlawful practices described above, a declaration that Conagra's conduct violates the Consumer Legal Remedies Act, reasonable attorneys' fees and litigation costs, and any other relief authorized by CLRA that the Court deems proper.

**COUNT IV**
**Violation of the California False Advertising Law ("FAL")**
**California Civil Code §§ 17500, et seq.**
**(On Behalf of Plaintiff Gamboa and the California Class)**

211.    Plaintiff Gamboa, individually and on behalf of the California Class, brings this cause of action and hereby adopt and incorporate by reference all allegations contained in Paragraphs 1-210 as if set fully set forth herein.

212.    The conduct described herein took place in the State of California and constitutes deceptive or false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

213.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

214.    It is also unlawful under the FAL to make or disseminate any advertisement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

215.    Defendant represents to consumers, including Plaintiff Gamboa and California Class Members, in its marketing and advertising and on its Products' packages that the Products are made with "only real ingredients" and "100% ingredients from natural sources" when, in reality, they contain unnatural, human-made PFAS chemicals known to be harmful to humans and the environment.

216.    At the time of its misrepresentations, Defendant was aware that the Products contained PFAS chemicals.

217. Defendant concealed, omitted, or otherwise failed to disclose the true nature of its Products to consumers, including Plaintiff Gamboa and California Class Members.

218. Defendant's descriptions of its Products are false, misleading, and likely to deceive reasonable consumers, and did mislead Plaintiff Gamboa and California Class Members.

219. Defendant's conduct therefore constitutes deceptive or misleading advertising under the FAL.

220. Plaintiff Gamboa has standing to pursue claims under the FAL as she reviewed and relied on Defendant's representations regarding its Products when choosing and purchasing the Products.

221. In reliance on the statements made in Defendant's advertising and marketing materials and on the Products' packaging, and Defendant's omissions and concealment of material facts regarding the Products, Plaintiff Gamboa and California Class Members purchased the Products.

222. Had Defendant disclosed the true nature of the Products, specifically the presence of unnatural, human-made, harmful PFAS chemicals, Plaintiff Gamboa and California Subclass Members would not have purchased the Products or would have paid substantially less for them.

223. As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has received ill-gotten gains and/or profits, including but not limited to money from Plaintiff Gamboa and California Class Members who paid for the Products containing PFAS chemicals.

224. Plaintiff Gamboa and California Class Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendant by means of its deceptive or misleading representations, including monies already obtained from Plaintiffs and

California Class Members as provided for by the Cal. Bus. & Prof. Code § 17500, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices, and any other relief authorized by the FAL that the Court deems proper.

**COUNT V**
**Violations of the California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, et seq.**
**(On Behalf of Plaintiff Gamboa and the California Class)**

225. Plaintiff Gamboa, individually and on behalf of the California Class, brings this cause of action and hereby adopt and incorporate by reference all allegations contained in Paragraphs 1-224 as if set fully set forth herein.

226. Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

227. Consumers, including Plaintiff Gamboa and California Class Members, who purchased the Products, suffered an injury by virtue of buying products for which Defendant misrepresented and/or omitted the Products' true qualities and ingredients. Had Plaintiff Gamboa and California Class Members known that Defendant falsely and materially misrepresented the Products and/or omit material information regarding the Products and their ingredients, they would not have purchased the Products.

228. Defendant's conduct, as alleged herein, violates the laws and public policies of the State of California and the federal government, as set out in the preceding paragraphs of this Complaint.

229. There is no benefit to consumers or competition by allowing Defendant to deceptively market and advertise the Products.

230. Plaintiff Gamboa and California Class Members who purchased the Products have no way of reasonably knowing that the Products are deceptively marketed and advertised; do not

have the qualities they are represented to possess; contain ingredients that are not natural and/or naturally sourced; and are unsuitable for their intended use. Thus, Plaintiff Gamboa and California Class Members could not have reasonably avoid the harm they suffered.

231. Specifically, Defendant marketed, advertised and represented that the Products were made with only "real ingredients" or "100% ingredients from natural sources," when in fact the Products contain potentially harmful, unnatural, human-made PFAS chemicals.

232. The gravity of harm suffered by Plaintiff Gamboa and California Class Members who purchased the Products will suffer outweighs any legitimate justification, motive, or reason for marketing, advertising, or packaging the Products in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous, and offend the established public policies of the State of California and the federal government. Defendant's actions are substantially injurious to consumers, Plaintiff Gamboa and California Class Members.

233. Defendant's dissemination of the above-described misleading and deceptive representations to consumers throughout the State of California, including to Plaintiff Gamboa and California Class Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendant's Products, and thus constitute violations of Cal. Bus. & Prof. Code §§ 17500, et seq.

234. As a result of Defendant's unlawful, unfair and fraudulent acts and practices, Plaintiff Gamboa, on behalf of herself and the California Class, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendant's wrongful conduct to the fullest extent permitted by law, and any other relief authorized by UCL that the Court deems proper.

## COUNT VI
### Violations of New York's Deceptive Practices Act,
### N.Y. Gen. Bus. Law § 349
### (Plaintiff Koenig Individually and on Behalf of the New York Class)

235.    Plaintiff Koenig, individually and on behalf of the New York Class, brings this cause of action and hereby adopt and incorporate by reference all allegations contained in Paragraphs 1-234 as if set fully set forth herein.

236.    New York General Business Law ("GBL") § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce..." GBL § 349(a).

237.    In its sale of goods throughout New York, Defendant conducts business and trade within the meaning and intention of GBL § 349.

238.    The practices alleged herein—namely, deceiving customers into believing that the Products contained only ingredients from natural sources—are unfair, deceptive, and misleading in violation of GBL § 349.

239.    The foregoing deceptive acts and practices were directed at Plaintiff Koenig and other members of the New York Class.

240.    Defendant's misrepresentations regarding the Products are material to a reasonable consumer because they relate to the content and ingredients of the Products. A reasonable consumer attaches importance to such representations and is induced to act thereon in making purchase decisions.

241.    Plaintiff Koenig and members of the New York Class have been injured as a direct and proximate result of Defendant's unlawful acts as they would not have purchased, or would have paid less for, Defendant's Products marketed as containing only natural ingredients but for Defendant's material misrepresentations as described in this Complaint.

242.     As a result of Defendant's unlawful action, Plaintiff Koenig and members of the New York Class seek to enjoin Defendant's deceptive and unlawful acts and practices described herein; to recover the greater of their actual damages or fifty dollars; and to recover treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

**COUNT VII**
**Violations of New York's Deceptive Practices Act,**
**N.Y. Gen. Bus. Law § 350**
**(Plaintiff Koenig Individually and on Behalf of the New York Class)**

243.     Plaintiff Koenig, individually and on behalf of the New York Class, brings this cause of action and hereby adopt and incorporate by reference all allegations contained in Paragraphs 1-242 as if set fully set forth herein.

244.     GBL § 350 provides in relevant part: "False advertising in the conduct of any business, trade or commerce . . . in this state is hereby declared unlawful."

245.     In turn, GBL § 350-a defines false advertising as:

> "advertising, including labeling, of a commodity...if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity...to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual."

246.     Defendant's actions are untrue and materially misleading through their deceptive packaging, marketing, and advertising of the Products, which deceives consumers into believing the Products contain only ingredients from natural sources, when they do not.

247.     Defendant's misrepresentations regarding the Product are material to a reasonable consumer because they relate to the content and ingredients of the Products. A reasonable

consumer attaches importance to such representations and is induced to act thereon in making purchase decisions.

248.    Plaintiff Koenig and the New York Class Members were induced to purchase the Products by Defendant's misrepresentations in its packaging, advertising, and marketing.

249.    Plaintiff Koenig and members of the New York Class have been injured as a direct and proximate result of Defendant's violations described above as they would not have purchased, or would have paid less for, Defendant's Products marketed as containing only natural ingredients but for Defendant's material misrepresentations as described in this Complaint.

250.    As a result of Defendant's unlawful action, Plaintiff Koenig and members of the New York Class seek to enjoin Defendant's misleading and unlawful acts and practices described herein; to recover the greater of their actual damages or five hundred dollars per violation; and to recover treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

### COUNT VIII
**Violations of the Florida Deceptive and Unfair Practices Act ("FDUTPA")**
**Florida Statutes § 501.201 *et seq.***
**(Plaintiff McGlone Individually and on Behalf of the Florida Class)**

251.    Plaintiff McGlone, individually and on behalf of the Florida Class, brings this cause of action and hereby adopt and incorporate by reference all allegations contained in Paragraphs 1-250 as if set fully set forth herein.

252.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq*. ("FDUTPA"). The stated purpose of FDUTPA is to "protect the consuming public...from those who engage in unfair methods or competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202(2).

253.    Plaintiff McGlone and all members of the Florida Class were, at all relevant times, consumers, as defined by Fla. Stat. § 501.203(7).

254.    Defendant at all relevant times was engaged in trade or commerce as defined by by Fla. Stat. § 501.203(8).

255.    Fla. Stat. § 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

256.    Defendant engaged in unfair and deceptive acts, in violation of Fla. Stat. § 501.204(1), as described herein by, *inter alia*, marketed, advertised and represented that the Products were made with only "real ingredients" or "100% ingredients from natural sources," when in fact the Products contain potentially harmful, unnatural, human-made PFAS chemicals.

257.    At all times relevant to this action, Defendant was aware that the Products contained human-made PFAS chemicals in direct contradiction to its uniform packaging, labeling, and other marketing representations.

258.    Defendant's unfair and deceptive acts were likely to deceive reasonable consumers, and in fact did deceive Plaintiff McGlone and Florida Class Members, as to the true nature of the Products.

259.    Defendant's practices offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers.

260.    Plaintiff McGlone and Florida Class Members have been aggrieved by Defendant's unfair and deceptive practices in that they paid for the Products which they would not have purchased, or would have paid less for, but for Defendant's deceptive, misleading, and unfair practices as described more fully herein.

261.    The damages suffered by Plaintiff McGlone and Florida Class Members were directly and proximately caused by the deceptive, misleading and unfair practices of Defendant, as described in this Complaint.

262.    Pursuant to Fla. Stat. § 501.211(1), Plaintiff McGlone and Florida Class Members seek a declaratory judgment and court order enjoining the above-described wrongful acts and practices of Defendant, and for restitution and disgorgement.

263.    Additionally, pursuant to Fla. Stat. §§ 501.211(2) and 501.2105, Plaintiff McGlone and Florida Class Members make claims for damages, attorneys' fees, and costs.

## COUNT IX
### Violation of State Consumer Protection Statutes
#### (On Behalf of Plaintiffs and the Multi-State Consumer Protection Class)

264.    Plaintiffs, individually and on behalf of the Multi-State Consumer Protection Class, bring this cause of action and hereby adopt and incorporate by reference all allegations contained in Paragraphs 1-263 as if set fully set forth herein.

265.    Plaintiffs and Multi-State Consumer Protection Class Members have been injured as a result of Defendant's violations of the state consumer protection statutes listed above in paragraph 152 and footnote 47, which also provide a basis for redress to Plaintiffs and Multi-State Consumer Protection Class Members based on Defendant's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

266.    Defendant's conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class.

267.    Defendant violated the Multi-State Consumer Protection Class states' unfair and deceptive acts and practices laws by representing that their Products are made with "100%

ingredients from natural sources" and "only real ingredients," when, in reality, they contain unnatural, human-made PFAS chemicals known to be harmful to humans and the environment.

268. Defendant's misrepresentations were material to Plaintiffs' and Multi-State Consumer Protection Class Members' decision to purchase the Products or pay a premium for the Products.

269. Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

270. As a result of Defendant's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiffs and Multi-State Consumer Protection Class Members purchased and paid for Products that did not conform to Defendant's Product promotion, marketing, advertising, packaging, and labeling, and they were deprived of the benefit of their bargain and spent money on Products that did not have any value or had less value than warranted or Products that they would not have purchased and used had they known the true facts about them

271. As a result of Defendant's violations, Defendant has been unjustly enriched.

272. Pursuant to the aforementioned States' unfair and deceptive practices laws, Plaintiffs and Multi-State Consumer Protection Class Members are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

## COUNT XI
## Unjust Enrichment/Quasi-Contract
## (On Behalf of Plaintiffs and the Nationwide Class)

273.     Plaintiffs, individually and on behalf of the Nationwide Class, bring this cause of action and hereby adopt and incorporate by reference all allegations contained in Paragraphs 1-272 as if set fully set forth herein.

274.     Defendant's unfair and unlawful contract includes, among other things, making false and misleading representations and omissions of material fact, as set forth in this Complaint. Defendant's acts and business practices offend the established public policy of Illinois, as there is no societal benefit from false advertising, only harm. While Plaintiffs and Class members were harmed at the time of purchase, Defendant was unjustly enriched by its misrepresentations and omissions.

275.     Plaintiffs and Class Members were harmed when purchasing Defendant's Products as a result of Defendant's material representations and omissions, as described in this Complaint. Each Plaintiff and Class Member purchased Defendant's Products. Plaintiffs and Class Members have suffered injury in fact and lost money as a result of paying the price they paid for the Products as a result of Defendant's unlawful, unfair, and fraudulent business practices.

276.     Defendant's conduct allows Defendant to knowingly realize substantial revenues from selling its Products at the expense of, and to the detriment of, Plaintiffs and Class Members, and to Defendant's benefit and enrichment. Defendant's retention of these benefits violates fundamental principles of justice, equity, and good conscience.

277.     Plaintiffs and Class Members confer significant financial benefits and pay substantial compensation to Defendant for its Products, which are not as Defendant represents them to be.

278.     Under common law principles of unjust enrichment and quasi-contract, it is inequitable for Defendant to retain the benefits conferred by Plaintiffs' and Class Members' overpayments.

279.     Plaintiffs and Class Members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class Members may seek restitution.

## JURY DEMAND

280.     Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of other members of the proposed Classes, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendant as follows:

A.     Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiffs as Class Representatives and appointing the undersigned counsel as Class Counsel;

B.     Ordering payment of actual and punitive damages, restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the Class Members as a result of Defendant's unlawful, unfair and fraudulent business practices;

C.     Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

D.     Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiffs and the other members of the Classes;

E.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts

awarded; and

F.      Ordering such other and further relief as may be just and proper.


Dated: May 6, 2022                    Respectfully submitted,

                                      */s/ Melissa K. Sims*
                                      Melissa K. Sims
                                      MILBERG COLEMAN BRYSON
                                      PHILLIPS GROSSMAN, PLLC
                                      111 West Jackson Boulevard, Suite 1700
                                      Chicago, IL 60604
                                      T: (815) 878-4674
                                      msims@milberg.com

                                      Melissa S. Weiner
                                      **PEARSON, SIMON & WARSHAW, LLP**
                                      800 LaSalle Avenue, Suite 2150
                                      Minneapolis, Minnesota 55402
                                      T: (612) 389-0600
                                      mweiner@pswlaw.com

                                      Rachel Soffin*
                                      **MILBERG COLEMAN BRYSON PHILLIPS
                                      GROSSMAN PLLC**
                                      800 S. Gay Street, Suite 1100
                                      Knoxville, TN 37929
                                      T: 865-247-0080
                                      F: 865-522-0049
                                      rsoffin@milberg.com

                                      Harper T. Segui
                                      **MILBERG COLEMAN BRYSON PHILLIPS
                                      GROSSMAN PLLC**
                                      825 Lowcountry Blvd., Suite 101
                                      Mt. Pleasant, SC 29464
                                      T: 919-600-5000
                                      hsegui@milberg.com

Erin Ruben
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
*eruben@milberg.com*

Rachel Dapeer
**DAPEER LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
T: 305-610-5223
*rachel@dapeer.com*

*\*Application to be admitted pro hac vice is forthcoming*

*Attorneys for Plaintiffs & Proposed Classes*